

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| TAI SHEN KUO, | ) |
| a/k/a  Tai Kuo, | ) |
| Kuo Tai Shen, | ) |
| | ) |
| GREGG WILLIAM BERGERSEN, | ) |
| | ) |
| and | ) |
| | ) |
| YU XIN KANG, | ) |
| a/k/a  Kang Yu Xin, | ) |
| Katie, | ) |
| | ) |
| Defendants. | ) |

**UNDER SEAL**

Case No. 1:08mj98

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, THREE ARREST WARRANTS, AND THREE SEARCH WARRANTS

I, Frances Robb Hourihan, being duly sworn, depose and state as follows:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed for nine and one-half years.  I am currently assigned to the Washington Field Office.  My initial training at the FBI Academy in Quantico, Virginia, included specialized training in national security investigations, and I have received additional specialized training in national security matters since that time.  Throughout my tenure as an agent, I have been assigned to the investigation of national security matters, and I have participated in the execution of numerous arrest and search warrants during those investigations.

2.      This affidavit is submitted in support of a criminal complaint and three arrest warrants charging TAI SHEN KUO, who is also known as TAI KUO and KUO TAI SHEN, and YU XIN KANG, who is also known as KANG YU XIN and KATIE, with conspiracy to communicate information relating to the national defense to a foreign government, in violation of Title 18, United States Code, Section 794(a) and (c), and charging GREGG WILLIAM BERGERSEN with conspiracy to communicate information relating to the national defense to a person not entitled to receive it, in violation of Title 18, United States Code, Section 793(d) and (g). These charges arise from the unlawful passage of classified national defense information by GREGG WILLIAM BERGERSEN, a employee of the United States Department of Defense, to TAI SHEN KUO, who, unbeknownst to BERGERSEN, is an agent of the People's Republic of China (PRC).

3.      This affidavit is also submitted in support of applications for warrants to search, and to seize relevant evidence found within, two properties and one vehicle. The first property is the residence (and related outbuildings) of GREGG WILLIAM BERGERSEN located at 6226 Littlethorpe Lane, Alexandria, Virginia 22315. The second property is the work cubicle of GREGG WILLIAM BERGERSEN located within the Defense Security Cooperation Agency, 201 12th Street, South, Suite 303, Arlington, Virginia 22202. Both properties are located within the Eastern District of Virginia. Both properties are more fully described in Attachments A1 and A2, respectively. The vehicle is a red 2005 Honda Accord, vehicle identification number (VIN) 1HGCM66885A004866, bearing Virginia license JPB-9676, registered in the name GREGG WILLIAM BERGERSEN and BERGERSEN's wife. The vehicle is generally stored at 6226 Littlethorpe Lane, Alexandria, Virginia 22315, or the Defense Security Cooperation Agency,

both within the Eastern District of Virginia.

4.    Pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I seek authority to search both properties and the vehicle for evidence related to GREGG WILLIAM BERGERSEN's, TAI SHEN KUO's, and YU XIN KANG's unlawful activities described in this affidavit, which activities are in violation of Title 18, United States Code, Sections 793(d), (g), and 794(a), (c). The unlawful activities and the basis for the searches are more fully described below. The specific items to be searched for and seized are more fully described in Attachment B.

5.    This affidavit is based on my personal knowledge, information conveyed to me by other law enforcement officers, and my review of documents and records obtained during the course of the investigation. This affidavit contains information necessary to establish probable cause but does not include each and every fact known by me or known by the government.

## TAI SHEN KUO

6.    TAI SHEN KUO (KUO or TAI) is a naturalized United States citizen who was born in Taipei, Taiwan. KUO holds a United States passport and a Taiwanese passport. KUO lives primarily in New Orleans, Louisiana, and he owns a residence in Houma, Louisiana. KUO also travels regularly to the PRC, and he maintains an office in Beijing, PRC. KUO has discussed on several occasions his application for residency in the PRC. KUO has also directed the transfer of funds from at least one bank account in Hong Kong.

7.    KUO has a variety of business interests, primarily involving furniture, in the United States and the PRC. KUO has also taken steps to establish at least two companies in the United States to pursue contracts related to the United States' sale of defense technology to

3

Taiwan. KUO has cultivated and maintained relationships with several current United States

government employees, including GREGG WILLIAM BERGERSEN, former United States

government employees, and certain government contractors. KUO does not hold a United States

security clearance and, therefore, he is not entitled to view or possess United States classified

information.

8.     KUO maintains a close relationship with an official of the government of the

PRC, identified below as PRC OFFICIAL A, and KUO has provided that official with United

States national defense information acquired from GREGG WILLIAM BERGERSEN, as more

fully described below. KUO also maintains a close relationship with YU XIN KANG, identified

further below, and KUO has used YU XIN KANG to exchange information with PRC

OFFICIAL A, as more fully described below. KUO also maintains relationships with various

officials from the Taiwan Ministry of Defense.

9.     KUO corresponds regularly with PRC OFFICIAL A, YU XIN KANG, and

GREGG WILLIAM BERGERSEN by telephone and email. The FBI has monitored certain of

KUO's telephone and email contacts with these individuals, pursuant to court authorized

warrants. For each of the telephone conversations described below, KUO or KUO's daughter is

the record subscriber for the telephone used by KUO. The FBI has also surreptitiously copied the

hard drive in a laptop computer used by KUO, pursuant to court authorized warrants. The laptop

has been found to contain certain of KUO's email communications. I describe below some of

KUO's telephone and email communications.

10.     KUO has been in contact with PRC OFFICIAL A at five different overseas

telephone numbers found during a court authorized search of KUO's possessions. In October

4

2006, the FBI surreptitiously searched KUO's belongings while they were stored in a Las Vegas, Nevada, hotel room. KUO's papers included a document written in Mandarin Chinese entitled, "Tai's Friends." PRC OFFICIAL A's name appeared on the list with numerous telephone numbers located in the PRC and Hong Kong; calls have been placed to or received from five of those numbers by KUO in the United States.

11.     KUO has used email accounts through Internet Service Providers (ISPs) Bellsouth.net, Hotmail, and Gmail when corresponding by email with PRC OFFICIAL A, YU XIN KANG, GREGG WILLIAM BERGERSEN, and others. KUO registered for each of those accounts in his name, written as TAI KUO.

### YU XIN KANG

12.     YU XIN KANG (KANG) is a citizen of the PRC and a United States Lawful Permanent Resident Alien. During a majority of the time period relevant to this affidavit, KANG lived in the PRC and periodically visited the United States. KANG began living in New Orleans, Louisiana, in September 2007. Before moving to New Orleans, KANG and KUO discussed KANG remaining in the United States for approximately six months.

13.     KANG represents herself as an employee of KUO's furniture company. As detailed below, KANG has periodically served as a conduit of information between PRC OFFICIAL A and KUO. I know through my training and experience that intelligence officers and agents often use such intermediaries – known as "cut outs" – to avoid direct contact when exchanging information and documents. KUO told KANG on at least one occasion that PRC OFFICIAL A pays KUO for the work that he performs, and that KUO in turn uses that money to support KANG.

5

14.     KANG has periodically corresponded with KUO using an email account at Yahoo! I have reviewed the header information on KANG's emails as they appeared in KUO's email in-boxes. The header information shows the account user name as, "Yuxin Kang." The contents of the emails from this account relate directly to KANG's telephone conversations with KUO.

## PRC OFFICIAL A

15.     PRC OFFICIAL A is based in Guangzhou, PRC, and Hong Kong. Between January 2006 and September 2007, KUO made several statements during telephone conversations indicating that PRC OFFICIAL A is a PRC government official. For example, in January 2006, KUO told KANG that PRC OFFICIAL A would probably go to his office to return her call because the "Country" would pay the bill if PRC OFFICIAL A used the office telephone. In addition, in June 2007, KUO stated that PRC OFFICIAL A sees KUO during each of KUO's trips to Beijing, PRC, because the "Central Committee has assigned him to take care of me."

16.     PRC OFFICIAL A appears by name in two address books found among the possessions of a former engineer for a United States defense contractor who was convicted in the United States District Court for the Central District of California of conspiracy to violate export control laws, two counts of attempting to violate export control laws, acting as an agent of the PRC without notification, and making a false statement to federal investigators. The engineer's wife, brother, sister-in-law and nephew pleaded guilty to related charges. The engineer's wife admitted that conspirators within the PRC, including PRC Individual A, provided them with lists of United States national defense information wanted by the PRC. The engineer then collected the targeted information and conspired with family members to transfer the information to the

6

PRC.

17.    An address book seized from the engineer contained an entry for PRC OFFICIAL A next to two PRC telephone numbers, all of which was next to an entry for PRC Individual A. The engineer had another address book with yet another PRC telephone number for PRC OFFICIAL A. All three telephone numbers for PRC OFFICIAL A found inside the engineer's address books also appear on KUO's list, "Tai's Friends," next to PRC OFFICIAL A's name.

### KUO's Communications with PRC OFFICIAL A

18.    PRC OFFICIAL A and KUO have used various forms of tradecraft to communicate covertly, including using KANG as a cut out. KUO has also stated explicitly to PRC OFFICIAL A that there is a need for care because the United States is watching "China's spy action." On September 22, 2007, KUO wrote an encrypted email message to PRC OFFICIAL A stating that KUO "will try to go to dc on the 3rd week of oct. have to be careful now. dc is really watch Russia and China's spy action. kang been get off the plane in Chicago (person waited her at gate) then question for ½ hours. don't know why?"[*] KANG raised a similar topic during a telephone conversation with KUO approximately one month earlier when calling KUO to pass on an inquiry from PRC OFFICIAL A: whether KUO had arrived back in the United States safely. During the conversation, KANG asked, "you were searched - searched - getting spooked?"

19.    KUO has corresponded by email with PRC OFFICIAL A at several different addresses. I have reviewed the header information on PRC OFFICIAL A's emails as they

---

[*]I provide verbatim recitations of emails and conversations throughout this affidavit. I have written them as they appeared or occurred, including spelling and grammatical errors.

appeared in KUO's email in-boxes. The Header information shows PRC OFFICIAL A's accounts to be registered under false names at Yahoo! and Hotmail. Also, in general, header information shows PRC OFFICIAL A to have sent these emails from Internet Protocol (IP) addresses that are registered in Guangzhou, PRC, or Hong Kong. I have attributed these email accounts to PRC OFFICIAL A because the contents of their correspondence with KUO's email accounts relate directly to PRC OFFICIAL A and KUO's telephone communications. For example, KUO has at various times received emails from these accounts directing him to call "009" or "hk009" or "009h/k," a digit sequence that matches the last three digits in a telephone number listed on KUO's list, "Tai's Friends." KUO has at times then called that telephone number within 24 hours of receiving the email directing him to call. Also, the contents of the emails from these addresses indicate that they originated from a single common author.

20.    PRC OFFICIAL A also uses an email account through Hutchcity, an ISP based in Hong Kong. I refer to this address as the "Hutchcity email account" in the balance of the affidavit. PRC OFFICIAL A has directed KUO to this account in numerous emails from PRC OFFICIAL A's other accounts registered at Hotmail and Yahoo! Based on my training and experience, I know that using email accounts serviced at a foreign ISP is a way to avoid detection by United States law enforcement personnel. PRC OFFICIAL A and KUO's use of the Hutchcity email account demonstrates their use of tradecraft to communicate covertly.

21.    PRC OFFICIAL A and KUO have used PGP Desktop Home 9.5 for Windows, a commercially-available encryption package, for certain of their email correspondence. In January 2007 and February 2007, KUO and PRC OFFICIAL A discussed the encryption software by telephone. KUO purchased the software in February 2007, and they began using it in March

8

2007. During later surveillance of KUO's internet activity and a court authorized surreptitious search of KUO's residence, FBI personnel found and seized certain user files and other information necessary to operate the specific encryption package purchased by KUO. PRC OFFICIAL A and KUO's use of commercially available encryption software further demonstrates their use of tradecraft to communicate covertly.

## GREGG WILLIAM BERGERSEN

22.     GREGG WILLIAM BERGERSEN (BERGERSEN) is a Weapon Systems Policy Analyst at the Defense Security Cooperation Agency (DSCA), located at 201 12th Street, South, Suite 203 and 303, Arlington, Virginia, 22202, within the Eastern District of Virginia. BERGERSEN occupies a desk and a cubicle within Suite 303, as more fully described in Attachment A2. BERGERSEN has a computer in his cubicle through which he gains access to a DSCA email account registered in his name.

23.     DSCA is an agency within the United States Department of Defense (DOD) that implements DOD's Foreign Military Sales (FMS) program. The FMS program is the means by which the United States transfers defense articles, services, and training to other sovereign nations and international organizations. The United States procures defense articles and services on behalf of the foreign customer through the FMS program, and the customer then pays for such articles and services with its own national funds or through certain United States assistance programs.

24.     BERGERSEN maintains a Top Secret security clearance, with access to Sensitive Compartmented Information (SCI). In order to obtain his security clearance, BERGERSEN was required to sign a Classified Information Nondisclosure Agreement acknowledging his obligation

and duty not to disclose classified information to unauthorized persons. BERGERSEN explicitly acknowledged in the agreement that "the unauthorized disclosure . . . of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation." Also, BERGERSEN acknowledged that disclosure of classified information may constitute a violation of United States criminal laws, including Title 18, United States Code, Section 793.

25.     Under Executive Order 12958, as amended by Executive Order 13292, national security information is classified as Top Secret, Secret, or Confidential. The designation "Top Secret" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." The designation "Secret" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to national security." The designation "Confidential" applies to information, "the unauthorized disclosure of which reasonably could be expected to cause damage to national security." Access to classified information at any level may be further restricted through compartmentalization in SCI categories. Classified information, of any designation, may only be shared with persons determined by an appropriate United States government official to be eligible for access to classified information, who have signed an approved non-disclosure agreement, and who possess a need to know. If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

26.     BERGERSEN lives with his wife in a townhouse located at 6226 Littlethorpe Lane, Alexandria, Virginia 22315, within the Eastern District of Virginia, as more fully described in Attachment A1.

## C4ISR

27.    C4ISR is the acronym used to designate a group of military functions, including, command, control, communications, computers, intelligence, surveillance, and reconnaissance. As used herein, C4ISR is a short-hand reference to inter-related systems that collect, transmit, process, display, and manage information for the armed forces.  DSCA is responsible for coordinating FMS sales of C4ISR technology once such sales have been approved by Congress.

28.    Space and Naval Warfare Systems Command (SPAWAR) is a DOD agency located in San Diego, California.  SPAWAR is responsible for the development of C4ISR technology including, among other items, secure communications systems.  SPAWAR Systems Center, Charleston, South Carolina ("SPAWAR Charleston"), is one of SPAWAR's five program directorates.  SPAWAR Charleston supports SPAWAR's mission by providing engineering and integration solutions.  SPAWAR and SPAWAR Charleston work with private contractors to perform certain tasks related to the development of C4ISR technology.

29.    One crucial security cooperation goal for nations purchasing C4ISR technology is compatibility with United States military systems.  Accordingly, DSCA has stated its intention to release systems that promote communications between friendly forces and the United States forces.  In order to develop such systems, DOD periodically holds conferences – known as Interoperability Management Board or IMB conferences – with certain nations or organizations purchasing C4ISR technology.

30.    In 2003, Taiwan implemented its C4ISR program, known as Po Sheng, which translates to "Broad Victory."  Po Sheng is intended to enhance Taiwan's C4ISR foundational capabilities.  Taiwan will purchase a substantial amount of the technology for Po Sheng directly

11

from the United States government through the FMS process. KUO has taken steps to establish two companies in an effort to obtain sub-contracts for items to be sold to Taiwan for Po Sheng.

31.     I know from official statements by DOD that the PRC is interested in the relationship between the military forces of the United States and Taiwan. Specifically, in its Annual Report to Congress on the Military Power of the PRC for 2007, DOD stated that the PRC is currently focused on preparing for "military contingencies in the Taiwan Strait, including the possibility of U.S. intervention." DOD stated in the same report that Taiwan has taken steps to improve its "joint operations capability."

## Meeting in Alexandria, Virginia, March 3, 2007

32.     On March 3, 2007, KUO and BERGERSEN met for dinner at a restaurant in Alexandria, Virginia, and discussed Po Sheng and communications security. During their conversation, BERGERSEN revealed information about United States and Taiwan communications security, requested that KUO share the information with Taiwanese officials, and asked KUO to arrange a meeting with Taiwan Ministry of Defense officials.

33.     FBI personnel have shown a transcript of BERGERSEN and KUO's conversation from March 3, 2007, to the Director of Intelligence at the United States Pacific Command (PACOM). PACOM is responsible for the relationship and interaction between the United States military and Taiwan's military forces. The Director said that certain of BERGERSEN's statements to KUO about United States and Taiwan communications security contained information classified. The Director is an original classification authority and, therefore, he is qualified to render an opinion on the classification of BERGERSEN's statements.

12

## Meeting in Las Vegas, Nevada, April 6 to 9, 2007

34.     Between April 6 and 9, 2007, KUO and BERGERSEN met in Las Vegas, Nevada.
On the day that they arrived, April 6, 2007, FBI personnel heard BERGERSEN say to KUO "this
is all the shit I got for you." FBI personnel later surreptitiously searched KUO and
BERGERSEN's hotel room pursuant to a court authorized warrant and found several unclassified
DOD documents in KUO's suitcase. That night in a casino, KUO removed a wallet from his
back pocket and handed it to BERGERSEN. BERGERSEN removed several bills from the
wallet, handed them to the dealer in exchange for poker chips, and then proceeded to play poker.
BERGERSEN and KUO were later seen entering a show. KUO previously purchased two tickets
for that show on approximately March 21, 2007, paying a total cost of $275.00.

35.     The next day, April 7, 2007, KUO used his laptop to send a message to PRC
OFFICIAL A at the Hutchcity email account reading, "bookg didn't gring gig but he said he will
send me as much as he can when he goes back to dc. and he also said will print out the sale of T
for 5 years." In that same message, KUO also reported that "G" brought "books," and then listed
by name ten unclassified DOD publications found in KUO's suitcase on April 6, 2007, as
described above. Throughout this investigation, KUO and PRC OFFICIAL A have referred to
documents as "books," and they have referred to BERGERSEN as "g" or "G," which is the first
initial of BERGERSEN's first name. Based on other statements by KUO and BERGERSEN,
some of which are described below, I believe "gig" refers to the Global Information Grid, a
world-wide network that links together major DOD sites.

36.     Later that same day, April 7, 2007, BERGERSEN and KUO had dinner at a
restaurant in Las Vegas. FBI personnel overheard BERGERSEN asking KUO whether KUO had

13

ever mentioned BERGERSEN to anyone "in your country." KUO said, "no, no," and BERGERSEN replied, "Good, because I'll deny it. I swear I will testify that there is nothing going on." Following dinner, KUO and BERGERSEN entered a concert. KUO previously purchased two tickets for that concert on March 21, 2007, paying a total cost of $597.45.

37.     On April 8, 2007, KUO used his laptop to send another message to PRC OFFICIAL A at the Hutchcity email account. The text of the message read in part, "will be in bj on the 12 and go to sh on 17th then vietnam on 17th night then back to bj on the 19th then lv bj on the 21th. told kang I will thbe ere on the 19th. recored something you might find interesting." KUO's later travel shows that KUO was describing his upcoming travel itinerary. I believe KUO's statement that he "recored something" means that he recorded statements made by BERGERSEN. I have observed KUO turn off what appeared to be digital voice recorder following another meeting with BERGERSEN, which I describe below.

38.     The next day, on April 9, 2007, BERGERSEN and KUO were each observed at the Las Vegas airport standing in line to check-in for outbound flights.

39.     On April 11, 2007, KUO received a call from PRC OFFICIAL A shortly before KUO boarded a plane at Chicago's O'Hare airport that was bound for Beijing, PRC. During that telephone conversation, KUO and PRC OFFICIAL A arranged to meet on April 15, 2007, in Beijing.

### Meeting in Charleston, South Carolina, May 21, 2007

40.     On May 21, 2007, BERGERSEN and KUO met at a hotel in Mt. Pleasant, South Carolina, just outside the Charleston area. BERGERSEN traveled to the area to attend a meeting at SPAWAR Charleston.

14

41.     On May 8, 2007, approximately two weeks before the Charleston meeting, KUO received a telephone call from PRC OFFICIAL A. During the conversation, PRC OFFICIAL A asked about the status of the "GIG" document, and KUO responded "21st; 21 st." KUO also informed PRC OFFICIAL A that "G" was looking for an unmarked copy of the roadmap. Approximately one week later, on May 15, 2007, KUO sent an email to BERGERSEN at DSCA reminding him "to bring the gig and taiwan paper." The next day, on May 16, 2007, KUO spoke to BERGERSEN by telephone, and KUO said, "last time you gave me some roadmap . . . a lot of stuff is blacked out, do you have anything without black out?"

42.     On May 21, 2007, FBI personnel surreptitiously searched KUO's room at the hotel in Mt. Pleasant, South Carolina, pursuant to a court authorized warrant, and found the following documents: (1) Implementing the Global Information Grid; (2) GIG Tactical Edge Networks Engineering White Paper Version 0.4 (dated August 26, 2005, "For Official Use Only, Draft"); (3) Evolving to the GIG and NNEC; (4) Information Operations Roadmap (dated October 30, 2003, and marked "Secret"; this document was declassified in January 2006; the strikeout was added when the document was declassified); (5) GIG Enterprise-Wide Systems Engineering Update (dated May 16, 2007, and marked "Pre-Decisional - Distribution Limited to SSEB"; SSEB is an acronym that refers to the Source Selection Evaluation Board).

**Post-Charleston Communications Between PRC OFFICIAL A, KUO, and KANG**

43.     On May 27, 2007, then back in Louisiana, KUO called PRC OFFICIAL A and asked if he should send the "book" by mail. After a short discussion, PRC OFFICIAL A asked KUO to mail the "book" to the "address from last time" and to "tell me the number."

15

44.     The next day, May 28, 2007, KUO received an email at his Hotmail account from PRC OFFICIAL A with the following text:  "Why not asking K bring those bks??tell me the names of Gbk to hut...by pg."  Based on my review of PRC OFFICIAL A and KUO's email correspondence and its relationship to email correspondence between KUO and KANG, I believe "K" refers to KANG.  Later that same day, KUO used his laptop to send a message to PRC OFFICIAL A at the Hutchcity email account listing by name each of the documents found on May 21, 2007, in KUO's hotel room in South Carolina, as described above.  For this reason, "Gbk" likely refers to BERGERSEN ("G") and documents ("bk" or books), and "hut" and "pg" likely refer to the Hutchcity email account and the PGP encryption software, respectively.

45.     On May 31, 2007, KUO received an email from KANG's Yahoo! email account with the subject "address."  The message contained the Cantonese pronunciation of PRC OFFICIAL A's last name, an address in Hong Kong, a telephone number from KUO's list, "Tai's Friends," and one other number.

46.     On June 1, 2007, KUO received an email at his Hotmail account from PRC OFFICIAL A that read, in part, "K told u the address??..."  That same day, June 1, 2007, KUO sent an email to PRC OFFICIAL A reading, "mail it yesterday should be get to you on Wednesday."

47.     Three days later, on June 4, 2007, KUO sent an email to KANG's Yahoo! email account directing her to tell PRC OFFICIAL A the FedEx number contained in the email.  That same day, June 4, 2007, KUO also sent an email directly to PRC OFFICIAL A with the subject line, "books," and the message, "try one more time."  KUO attached to the email several documents about GIG that BERGERSEN had emailed to KUO the previous month.

16

48.    On June 5, 2007, KUO called KANG in the PRC.  KANG reported to KUO that PRC OFFICIAL A had received "it."  KANG also reported to KUO that PRC OFFICIAL A had been able to open an item that KANG understood KUO to have sent the day before, June 4, 2007. KUO asked KANG to call PRC OFFICIAL A and to ask specifically whether he had been able to open the two documents sent yesterday, referring to June 4, 2007.  Approximately five minutes after the conversation ended, KUO called KANG at the same PRC number.  KANG told KUO that PRC OFFICIAL A said, "the ones from yesterday can be read."

## Meeting in Loudoun County, Virginia, July 14, 2007

49.    In early July 2007, KUO and BERGERSEN made plans to meet on July 14, 2007, in the Washington, D.C., metropolitan area.  During one such telephone conversation on July 9, 2007, KUO reminded BERGERSEN that BERGERSEN had previously said that he was "gonna give me [KUO] that five year Taiwan sale."  In a later call the same day, BERGERSEN asked KUO if he was referring to sales to Taiwan for the past five years or projected sales for the next five years.  KUO responded, "yeah," and BERGERSEN replied, "that's hard stuff to get.  Um, I'll check into it.  I'll, I'll look see what I can do."

50.    KUO appears to have raised the topic of sales to Taiwan with PRC OFFICIAL A when KUO sent a message to the Hutchcity email account from Las Vegas on April 7, 2007, that read in part, "he also said will print out the sale of T for 5 years."  PRC OFFICIAL A mentioned the same issue during a May 8, 2007, telephone conversation with KUO, asking KUO about the status of KUO's request for the "five year sale thing."

17

51.     On July 9, 2007, KUO called KANG and KANG said that, "[PRC OFFICIAL A] had said - had said if you go to D.C., um - something. If you see uh - books and buy any books or something to let me tell him."

52.     On July 10, 2007, KUO and BERGERSEN again discussed KUO's upcoming trip to the Washington, D.C., area.  KUO reminded BERGERSEN that he wanted five years of Taiwan's weapons purchase information.  Later that same day, BERGERSEN told KUO over the telephone that he had obtained everything the United States had delivered to Taiwan from 1980 to the present, as well as the projected sales for the next five years.  The conversation included the following exchange:

KUO:                I want your DSCA, DSCA's paper.  Now I don't want CIA, I got CIA's paper.

BERGERSEN:          No--no, all this stuff, all this stuff is uh-

KUO:                DSCA.

BERGERSEN:          All this stuff is [unintelligible] now all this stuff is [unintelligible].  Well this is not this is this you know all this shit is classified man.

KUO:                Okay--okay--okay-okay.  Thank you, thank you.

BERGERSEN:          It's all classified.

KUO:                Thank you.  Thank you.  Thank you.  I appreciate it.

BERGERSEN:          Uh you know, we gotta be very careful about it.

KUO:                I will.  I will don't worry, don't worry.

BERGERSEN:          Alright man.

53.     On the morning of July 14, 2007, KUO flew from Louisiana to Baltimore Washington International airport (BWI).  KUO rented a car at BWI and drove to BERGERSEN's

18

residence, 6226 Littlethorpe Lane, Alexandria, Virginia 22315. FBI personnel observed KUO give BERGERSEN what appeared to be a cigar box, and BERGERSEN carried the box into his residence. Minutes later, KUO and BERGERSEN walked out of BERGERSEN's residence without the box and got into KUO's rental car. KUO and BERGERSEN then drove together to Washington-Dulles airport (Dulles) in Loudoun County, Virginia, where BERGERSEN was scheduled to board a flight to Bulgaria later that same day.

54.     While en route to Dulles, court authorized video and audio surveillance inside KUO's rental vehicle showed KUO placing a half-inch thick folded stack of cash into BERGERSEN's front shirt pocket. The outer bill was a $100 note. The two men then had the following exchange:

| | |
|---|---|
| BERGERSEN: | Now, the other information I gave you, um, I'm very, very, very, very, reticent to let you have it, because it's all classified . . . |
| KUO: | Oh, okay. |
| BERGERSEN: | . . . and, but I, I will let you see it . . . |
| KUO: | Uh-hmm, Uh-hmm |
| BERGERSEN: | . . . and you can take all the notes you want . . . |
| KUO: | Okay. |
| BERGERSEN: | . . . uh, which I think you can do today. But I, I, if it ever fell into the wrong hands, and I know it's not going to, but if it ever . . . |
| KUO: | Okay, that's fair [unintelligible], yeah, yeah. |
| BERGERSEN: | . . . was, then I would be fired for sure. I, I'd go to jail. |
| KUO: | Yeah. |
| BERGERSEN: | Because I violated all the rules. |

19

KUO:                Yeah.

BERGERSEN:    But I think when you see the information you can get out of it what
                you need.

KUO:                Yeah, okay.

BERGERSEN:    You know, you can write all the, you can take all the notes you
                want.

KUO:                Okay.

BERGERSEN:    It's just, I cannot . . .

KUO:                Okay.

BERGERSEN:    . . . ever let anyone know . . .

KUO:                Good, I got [unintelligible].

BERGERSEN:    . . . because that'll, that'll, I'll, that's my job.

KUO:                Yeah, Yeah.

BERGERSEN:    Uh, I'd get fired for sure on that.  Well, not even get fired, I'd go to
                fucking jail.  Um . . .

KUO:                I appreciate it, I appreciate [unintelligible].

BERGERSEN:    Well, yeah, but, but, but, but, we've got to be very careful about
                this.

55.     BERGERSEN and KUO stopped for lunch at a hotel in Loudoun County,

Virginia, before reaching Dulles.  FBI personnel observed KUO recording notes by hand while

looking at several pages that were stapled together.  While KUO was reviewing the document,

FBI personnel overheard BERGERSEN tell KUO that BERGERSEN intended to destroy the

document.

20

56.    FBI personnel then observed BERGERSEN leave the restaurant and walk to KUO's rental car. KUO remained at the restaurant table and resumed copying the document by hand. KUO spent approximately one hour recording notes. FBI personnel observed several compact discs on the table occupied by KUO. During the earlier car ride, BERGERSEN described diskettes that he intended to give to KUO, explaining that they were extremely sensitive and that they had to be returned to BERGERSEN. Afterwards, KUO walked outside to KUO's rental car and handed a document to BERGERSEN.

57.    BERGERSEN and KUO then departed for Dulles airport. As they approached the airport, the following conversation took place:

BERGERSEN:    Well I hope this all works out, I mean you are helping me a lot here . . .

KUO:    Thank you, thank you.

BERGERSEN:    . . . but, but, but I don't want anyone to know about our . . .

KUO:    No, no, of course not.

BERGERSEN:    . . . relationship or anything because ah, it could get me in a lot of trouble.

KUO:    It would kill my projects, shit, you think I would [unintelligible].

BERGERSEN:    Fuck, I'd go to jail, I don't wanna go to jail.

KUO:    I'd probably go to jail, too [chuckles].

        .    .    .

BERGERSEN:    You know, my friend, if you make me part of, of the owner . . .

KUO:    Yeah.

BERGERSEN:    . . . I will always steer . . .

21

| | |
|---|---|
| KUO: | Yes. |
| BERGERSEN: | . . . [unintelligible] that way. |
| KUO: | You will. |
| BERGERSEN: | But I, I will be very careful to keep my tracks... |
| KUO: | Of course. |
| BERGERSEN: | . . . clean. |
| KUO: | Of course. |
| BERGERSEN: | And no, no fingerprints.  It's just like these documents . . . |
| KUO: | Gotcha. |
| BERGERSEN: | . . . no fingerprints, I can't afford to lose my job. |
| KUO: | Just like we will did with Charleston, no fingerprints. |
| BERGERSEN: | Yeah, no fingerprints, oh yeah, that's clean . . . |
| KUO: | . . . [unintelligible]. |
| BERGERSEN: | . . . that's clean for me. |

58.    After BERGERSEN left KUO's rental vehicle, KUO removed what appeared to

be a digital voice recorder from his pocket and pressed a button.

59.    The next day, July 15, 2007, KUO returned to BWI and then to Louisiana.  Later

that same day, then back in Louisiana, KUO used his laptop to send a message to PRC

OFFICIAL A at the Hutchcity email account:

> [J]ust got back from DC and have good talk withh G . . . G went to Pogaria and gave me
> two paper is very very sensitive.  One is about T's future Sale and he couldn't give to me
> but let me hand write down most of imformation.  Another is the complete update of PS
> program, got everything in there about the program . . . .

I believe that PS is a reference to the Po Sheng program.

60.     On July 16, 2007, KUO received an email at his Hotmail account from PRC OFFICIAL A with the subject "bekk?" and the following text: "inform shedule pl." KUO replied the same day with the message: "21st in bj, 26th in HZ, 27th in SH, 29th in GZ. 30th to BJ, 31 to U.S. have two books for you! good!" KUO's later travel indicates that "bj"refers to Beijing, PRC. For this reason, I believe "HZ" refers to Hangzhou, "SH" refers to Shanghai, and "GZ" refers to Guangzhou.

61.     On July 17, 2007, KUO sent an email to PRC OFFICIAL A with a PGP encrypted message that included the text, "is anyway you can get July, aug and sep's to me on the 21st. gave g [] a lot this time cached." KUO also called KANG in the PRC twice that same day. In the first call, KUO asked KANG to have PRC OFFICIAL A call him immediately, and in the second call, KUO asked KANG to refer PRC OFFICIAL A to KUO's email, explaining that the email told PRC OFFICIAL A of KUO's need for money. KUO called KANG again the next day, July 19, 2007, and KANG was with PRC OFFICIAL A; KANG then handed the telephone to PRC OFFICIAL A.

62.     On July 20, 2007, Department of Homeland Security (DHS) personnel searched KUO and his belongings at Chicago's O'Hare airport just prior to KUO boarding a flight to Beijing, PRC. DHS personnel found several pages of handwritten notes that included references to military equipment. DHS photocopied the handwritten notes without KUO's knowledge and returned everything to KUO.

63.     I have compared the handwritten notes from KUO's luggage against a copy of the Calendar Year 2007 report of foreign military sales prepared by DSCA for Congress. The DSCA

report is entitled the "Javits Report." The 2007 Javits Report is classified SECRET and is marked as such. The Javits Report lists in spreadsheet format the potential military and direct commercial sales of military equipment from the United States to foreign nations. As a DSCA employee, BERGERSEN had access to the 2007 Javits Report. KUO's handwritten notes are a near-verbatim copy of portions of the Taiwan section of the 2007 Javits Report, listing the quantity, dollar value, and name of weapons system planned for sale to Taiwan over the next five years.

64.   FBI personnel have shown the Taiwan section of the 2007 Javits Report to the former Director of DSCA. The former director oversaw DSCA when the 2007 Javits Report was written and was the report's classifying authority. The former Director, an Army General, told FBI personnel that based on his knowledge of the FMS process, the document contained information relating to the national defense in that it identifies defense articles proposed for sale by the United States to Taiwan consistent with United States foreign policy and regional security. The former Director also said that the document was properly classified SECRET. Separately, FBI personnel spoke to the Chief of the Arms Transfer Division in the Office of Regional Security and Arms Transfers at the Department of State about the 2007 Javits Report. The Chief said that based on his knowledge of the FMS program, the information contained in the Javits Report could be used to the advantage of a foreign nation or could be used to the injury of the United States. The Chief of the Arms Transfer Division participates in the FMS process and, therefore, he is qualified to render an opinion on the potential use of the Javits Report.

65.   On August 7, 2007, KUO spoke to BERGERSEN by telephone. During the conversation, BERGERSEN told KUO that after returning from Bulgaria, his wife went through

24

his wallet and found "some money." BERGERSEN told KUO that he attributed the money to

gambling, and his wife then took half of it as her share. KUO offered to make up the difference,

and BERGERSEN declined. BERGERSEN went on to say, "Well, I don't want to put it in the

bank, because I don't want any record . . . you know."

### Meeting in Alexandria, Virginia, September 10, 2007

66.     On September 2, 2007, KUO called BERGERSEN. During the call, KUO and

BERGERSEN discussed KUO's upcoming trip to the Washington, D.C., area. KUO asked

BERGERSEN to make reservations for them at a Virginia restaurant. The following

conversation then took place:

| | |
|---|---|
| KUO: | Okay, and also give me some information on the [unintelligible] uh I-M-B. |
| BERGERSEN: | Oh yeah, because I'm in charge of that. |
| KUO: | Okay, I mean you were there, give me some stuff okay. |
| BERGERSEN: | I--I--I--I--I have all the information. I will - |
| KUO: | Good. |
| BERGERSEN: | I will provide it to you okay. |

I believe "IMB" refers to an Interoperability Management Board conference because

BERGERSEN attended an IMB conference in August 2007. Also, I believe BERGERSEN

previously discussed the conference with KUO because on May 29, 2007, KUO sent an email to

PRC OFFICIAL A that stated, in part, "by the way G want me to go [] with him on IMB meeting

with t, should I go. early aug."

67.     On September 10, 2007, FBI personnel observed BERGERSEN and KUO having

dinner at a restaurant in Alexandria, Virginia. At that time, KUO asked BERGERSEN, "how

25

was the IBM conference?" BERGERSEN said, "I have for you the, the, the uh, conference brochure. Inside I have a summary of everything that happened. Be very, very, very careful . . . Don't, don't, don't lose it." Following dinner, FBI personnel observed BERGERSEN and KUO exchanging items while standing on the sidewalk across the street from the restaurant. BERGERSEN then departed the area in a red 2005 Honda Accord bearing Virginia license JPB-9676. KUO departed the area separately and while in transit to his hotel, he called KANG and said that he had spent $710.00 on BERGERSEN, referring to BERGERSEN by a derogatory term.

     68.    Two days later, on September 12, 2007, KUO called PRC OFFICIAL A and the following conversation took place:

| | |
|---|---|
| KUO: | Okay, okay. Uh- a little bit later there is a- uh- don't know if I should send it to you or what. There is a document that is pretty important. |
| PRC OFFICIAL A: | Uh. |
| KUO: | I don't know if I should send it to you or what. |
| | . . . |
| KUO: | Pay attention- I told Gregg. I had also told G. |
| PRC OFFICIAL A: | Right, right, right, right. |
| KUO: | Pay attention... Also, he- he gave a IBM thing. IMB- IMB- |
| PRC OFFICIAL A: | Oh, oh, oh, oh. You- |
| KUO: | I-I took a look. |
| PRC OFFICIAL A: | You- is it... Did he give you an email thing or is it a written thing? |
| KUO: | Two- two written thing- two- two page writing. |

PRC OFFICIAL A:   Two page writing.  You did not- did not transfer to [unintelligible]?  Is it?

KUO:   Huh?

PRC OFFICIAL A:   Why don't you fax it - just fax it?  You can fax it.

KUO:   What is your fax number?

.   .   .

KUO:   Wait a moment, wait a moment, wait a moment . . . [pause] Sensitive, it's very sensitive.  Okay?

PRC OFFICIAL A:   What is it?

KUO:   It's very sensitive.

PRC OFFICIAL A:   Then you can- then you . . . Do you want to type it out again- type it out?

KUO:   I will type it out before giving it to you.  It's very sensitive.

.   .   .

PRC OFFICIAL A:   The H thing-

KUO:   Eh.

PRC OFFICIAL A:   Uh- uh- the H mail- don't- don't send hotmail.

KUO:   Okay, okay, okay, okay, okay.

PRC OFFICIAL A:   Uh, okay.

KUO:   Okay, okay, alright.

PRC OFFICIAL A:   Okay, okay, um.  When I receive it, I will let you . . .

69.    The next day, on September 13, 2007, a series of paragraphs were typed on KUO's laptop computer.  The resulting document was then PGP encrypted and saved to the hard drive of the laptop.  I have compared those paragraphs against the executive summary written for

27

the IMB conference attended by BERGERSEN in August 2007. The paragraphs are near-verbatim recitations of several paragraphs from the executive summary that are marked "(S)," a portion marking symbol that designates SECRET information.

70.    Later that day, September 13, 2007, KUO received two phone calls from PRC Official A. During the first call, PRC Official A asked whether KUO had written "it," and KUO explained that he had already written and sent "it" to Hutchcity. PRC Official A ended the call, and then called back approximately 30 minutes later to report that he had read "it."

71.    I have shown the document typed on KUO's laptop to the Director of Intelligence at the PACOM. The Director of Intelligence, a Navy Admiral, told me that based on his knowledge of the issues discussed during the August 2007 IMB conference, the document contained information relating to the national defense in that it describes communications between the United States military and certain foreign nations or organizations. I have also shown the document typed on KUO's laptop to the PACOM Director of Command, Control, Communications and Computer (C4) Systems, and he told me that the document contained information that is closely held and classified SECRET. The Director of C4 Systems also told me that the information could be used to the advantage of a foreign nation or could be used to damage the United States' national defense. The Director of C4 Systems is an original classification authority and, therefore, he is qualified to render an opinion on the document's classification.

**Planned Meeting**

72.    KUO has arranged to meet BERGERSEN on February 11, 2008, at a restaurant in Alexandria, Virginia. To that end, KUO has reserved a flight to BWI on February 10, 2008, and

BERGERSEN has reserved a table at the restaurant. Based on their past meetings, I think it is highly likely that BERGERSEN will provide classified national defense information and/or documents before, during, or after his dinner meeting with KUO.

## Summary of Probable Cause to Search BERGERSEN's Residence, Work Cubicle, and Vehicle

73.     As outlined above, there is probable cause to believe that BERGERSEN conspired to communicate information relating to the national defense to KUO, a person not entitled to receive it, in violation of Title 18, United States Code, Section 793(d), (g). There is also probable cause to believe that KUO and KANG conspired to communicate information relating to the national defense to a foreign government, namely, the PRC, in violation of Title 18, United States Code, Section 794(a), (c). Further, there is probable cause to believe that fruits, evidence, and instrumentalities of these crimes are located within BERGERSEN's residence, his work cubicle, described in Attachments A1 and A2, respectively, and his red 2005 Honda Accord.

74.     KUO met with BERGERSEN in BERGERSEN's residence on July 14, 2007, and BERGERSEN entered the residence carrying a box from KUO. The box was not in BERGERSEN's or KUO's possession when they left the residence. I also know that later that same day, KUO passed money to BERGERSEN and BERGERSEN passed a document and compact discs to KUO that were necessarily in BERGERSEN's possession while he was inside his residence. I also know that in the late evening of September 10, 2007, KUO passed a package to BERGERSEN after their dinner meeting, and BERGERSEN transported that package in his red 2005 Honda. Also, BERGERSEN and KUO have arranged to meet on February 11, 2008. Based on the July and September 2007 meetings, I think it highly likely that

29

BERGERSEN will pass or show additional documents to KUO during their meeting, and I think it highly likely that BERGERSEN will first store any such documents in his residence. Finally, as a general matter, I know through my training and experience that people who pass information or documents relating to the national defense to people not entitled to receive it often store such material in their residence to avoid transporting items directly from the original source to the ultimate recipient. I also know through experience that people store financial records, telephone bills, and personal records in their residences for long periods of time, and that such records show information about travel, telephone communications, and correspondence with associates.

75.    BERGERSEN has driven a red 2005 Honda Accord bearing Virginia license JPB-9676 to and from meetings with KUO, including their meeting on September 10, 2007. BERGERSEN has driven and continues to drive the same car to and from DSCA on a regular basis. Therefore, BERGERSEN has necessarily transported in that car items passed to or received from KUO. Also, as a general matter, I know through my training and experience that people who pass information or documents relating to the national defense to a person not entitled to receive it often store such material in their car (just as they do in their residence) to avoid transporting items directly from the original source to the ultimate recipient.

76.    BERGERSEN's only known source of classified information is his employer, DSCA; thus, it is highly probable that BERGERSEN's work cubicle contains copies of items identical or similar to those passed to KUO. I also know through discussion with BERGERSEN's employer that BERGERSEN's work cubicle contains a computer, and I also know that BERGERSEN has corresponded regularly with KUO through his DSCA email

30

account. For all these reasons, I seek authority to search the entire contents of BERGERSEN's

work cubicle and the computer in BERGERSEN's work cubicle.

### Authority to Search For and Seize Evidence of Illegal Activity

77.      In general terms, I seek authority to search for documents and other evidence of

the above-described crimes. The specific documents and other evidence that I seek to search for

and seize in each location are more fully described in Attachment B.

78.      Based on my training and experience, I know that the following items can

reasonably be expected to be present in the residence of someone who has passed classified

information to a person not entitled to receive it: hard drives; classified documents or diskettes

displaying classification markings; classified documents or diskettes with classification headers,

footers, or other classification markings removed; portable electronic equipment such as digital

cameras, cellular telephones, personal digital assistants (PDA's), video and audio recordings

containing data derived from or photographs of classified information; conventional cameras and

film containing photographs of classified information. I also know that documents that come

within the scope of the proposed search warrants can be, indeed were at one time, stored

electronically. Finally, I also know that someone who communicates information relating to the

national defense to a person not entitled to receive it often transports the information in an

electronic format to avoid detection. For all these reasons, I believe that any electronic storage

devices, including computers, within BERGERSEN's residence, DSCA cubicle, or red 2005

Honda Accord may be instruments of the crimes that I am investigating and/or will contain

records and documents within the scope of the proposed search warrants. Accordingly, I seek

31

authority to search any electronic storage media that I encounter in BERGERSEN's residence, BERGERSEN's work cubicle, or BERGERSEN's vehicle.

79.     Based upon my training and experience, I know that to retrieve completely and accurately data maintained in computer hardware or on computer software or other electronic storage media, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting.  Accordingly, I am also seeking authorization to seize any computers that may contain evidence of the criminal activity described above, as well as any other peripheral items that may be needed to conduct a proper search of the computers in a controlled environment.

80.     I know that computer searches often must be conducted by a computer specialist in a laboratory setting because of the following:

a.     Computer storage devices (such as hard drives, diskettes, and back-up tapes) can store the equivalent of thousands of pages of information.  Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names.  This may require searching authorities to examine all of the stored data to determine which particular files are evidence, fruits, and/or instrumentalities of a crime.  This sorting process can take substantial time, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

32

b.      Searching computer systems for criminal evidence is a highly technical

process requiring expert skill and a properly controlled environment. The vast array of computer

hardware and software available requires computer experts to specialize in some systems and

applications, so it is difficult to know before a search which expert is qualified to analyze any

given system and its data that might be found in a search.

c.      Data search protocols are exacting scientific procedures designed to

protect the integrity of the evidence and to recover even hidden, erased, compressed, password-

protected, or encrypted files. Because electronic evidence is extremely vulnerable to inadvertent

or intentional modification or destruction (both from external sources or from destructive code

imbedded in the system as a "booby trap"), a controlled environment is essential to its complete

and accurate analysis.

81.     Any computers or electronic media that I seize from BERGERSEN's residence,

work cubicle, or vehicle will be searched by a computer specialist as soon as reasonably possible.

If the search of any such computer or electronic media fails to place the computer, the electronic

media, or their contents within the scope of the warrant authorized by the Court, the computer or

electronic media will be promptly returned to BERGERSEN, unless the computer or electronic

media contains information that is obviously contraband or evidence of another crime, in which

case I will seek further search and seizure authority from the Court.

### Request for Authority to Execute Search Warrants
### Outside Daytime Hours (6 a.m. to 10 p.m.)

82.     I am seeking a warrant to search a work cubicle within the DSCA, an agency of

DOD. In order to minimize interference with the normal business-hours operation of DOD, I

request that the FBI be permitted to execute the proposed search warrant for BERGERSEN's work cubicle outside daytime hours (6 a.m. to 10 p.m.) if DOD officials so request.

83.     I am also seeking a warrant to search a residence. In order to prevent the destruction of evidence, I request that the FBI be permitted to execute the proposed search warrant for BERGERSEN's residence outside daytime hours (6 a.m. to 10 p.m.) under certain limited circumstances. I intend to execute the proposed search warrant for BERGERSEN's residence on the same morning that BERGERSEN is to be arrested pursuant to the arrest warrant sought by this affidavit. In the event that it becomes necessary to arrest BERGERSEN before 6 a.m. and BERGERSEN is either within the residence or within sight of the residence, such that his arrest could become known to any occupants of the residence, including his wife, it will also become necessary to execute the proposed search warrant of BERGERSEN's residence to prevent the destruction of evidence.

### Conclusion

84.     Based on the foregoing, I respectfully request that warrants be issued allowing me or any Special Agent of the FBI with proper assistance to enter the premises known as 6226 Littlethorpe Lane, Alexandria, Virginia 22315, the work cubicle of GREGG WILLIAM BERGERSEN located within the Department of Defense, Defense Security Cooperation Agency, 201 12th Street, South, Suite 303, Arlington, Virginia 22202, and the red 2005 Honda Accord, VIN 1HGCM66885A004866, bearing Virginia license JPB-9676, and therein search for the items described in Attachment B.

85.     Based on the foregoing, there is probable cause to believe that TAI SHEN KUO and YU XIN KANG conspired, with the intent or reason to believe that it is to be used to the

34

injury of the United States or to the advantage of a foreign nation, to willfully communicate, deliver, or transmit to a foreign government, that is, the PRC, documents or information relating to the national defense, in violation of Title 18, United States Code, Section 794(a) and (c).

86.    Based on the foregoing, there is also probable cause to believe that GREGG WILLIAM BERGERSEN, lawfully having access to documents or information relating to the national defense, which documents or information BERGERSEN had reason to believe could be used to the injury of the United States or to the advantage of a foreign nation, conspired to willfully communicate or deliver such documents or information to a person not entitled to receive it, that is, TAI SHEN KUO, in violation of Title 18, United States Code, Section 793(d) and (g).

Frances Robb Hourihan
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this 6th day of February 2008.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
Hon. Theresa C. Buchanan
United States Magistrate Judge

35