FILED IN OPEN COURT

MAY 13 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 1:08cr179 |
| ) | |
| TAI SHEN KUO, ) | |
|   a/k/a Tai Kuo, ) | |
|   a/k/a Kuo Tai Shen, ) | |
| ) | |
|       Defendant. ) | |

## STATEMENT OF FACTS

Should this matter proceed to trial, the United States would prove the following beyond a reasonable doubt:

1. From in or about March 2007 to on or about February 11, 2008, defendant TAI SHEN KUO unlawfully, knowingly and willfully conspired with a government official of the People's Republic of China (PRC), and others, to deliver United States national defense information to a foreign government, namely, the PRC, in violation of Title 18, United States Code, Section 794(a), (c).

2. Throughout this time period, defendant was a resident of New Orleans, Louisiana. Defendant traveled regularly to the PRC, and he maintained an office in Beijing, PRC. Defendant had a variety of business interests, primarily involving furniture, in the United States and the PRC. Defendant had also taken steps to establish two companies in an effort to obtain sub-contracts related to the United States' sale of defense technology to Taiwan.

3. Defendant maintained a close relationship with a Foreign Official of the PRC (the PRC Official) and provided him with sensitive United States government information acquired

from Gregg William Bergersen, including national defense information classified at the Secret level. Defendant used various forms of tradecraft to communicate covertly with the PRC Official. The PRC Official directed defendant to collect specific information and documents. The PRC Official sometimes provided handwritten lists of documents for defendant to obtain, including one list found in defendant's possession on February 11, 2008, that listed, "I. Clsfd Ann. Report (Navy PLA)," among other items. "Clsfd" means "classified" and PLA refers to the PRC's People's Liberation Army. Between approximately 2001 and February 11, 2008, the PRC Official paid defendant a total of approximately $50,000.00 for his services.

4. Throughout this time period, Bergersen was employed by the United States government as a Weapon Systems Policy Analyst at the Defense Security Cooperation Agency (DSCA), an agency within the Department of Defense (DoD). DSCA implements DoD's Foreign Military Sales (FMS) program. The FMS program is the means by which the United States transfers defense articles, services, and training to other sovereign nations and international organizations. Bergersen held a Top Secret security clearance with access to Sensitive Compartmented Information (SCI). His office at DSCA was located in Arlington, Virginia, within the Eastern District of Virginia.

5. Defendant gave money to Bergersen in order to cultivate their relationship. Defendant also led Bergersen to believe that in exchange for Bergersen's assistance, he would make Bergersen part owner or an employee of a company selling United States' defense technology to Taiwan after Bergersen's retirement from government service. On April 8, 2007, during a meeting between defendant and Bergersen in Las Vegas, Nevada, defendant said to Bergersen, "When my company get to the point . . . where I can pay you three, four-hundred

thousand a year, you come out." Bergersen agreed, but said also that he first wanted to work ten more years in order to secure full retirement benefits from the government. Defendant agreed with Bergersen, stating, "If you help me in the next ten, fifteen year[s], . . . you can . . . make it full [] retirement from the government and still get paid two, three-hundred thousand a year in my company, if- if- if you help me, you know, you understand what I'm saying?" In addition, on July 14, 2007, after allowing defendant to take notes from a portion of a classified report regarding planned United States' sales of military equipment to Taiwan, Bergersen told defendant that if he made Bergersen part owner of his company, Bergersen would "always steer" information his way.

      6.      Defendant maintained a close relationship with Yu Xin Kang. Kang periodically served as a conduit of information between the PRC Official and defendant. The information conveyed by Kang aided the PRC Official in communicating with and directing defendant, and it aided defendant in his delivery of information and documents to the PRC Official. Defendant provided financial support to Kang using the money provided to him by the PRC Official.

      7.      Kang is a citizen of the PRC and a Lawful Permanent Resident Alien of the United States. In September 2007, Kang moved from the PRC to New Orleans, Louisiana. On or about September 22, 2007, shortly after Kang's arrival in the United States, defendant described to the PRC Official an increasing need for care because the United States was now "really . . . watch[ing] . . . China's spy action," citing as evidence a stop and interview of Kang after she exited a plane in Chicago. Before moving to New Orleans and while inside the PRC, Kang communicated directly with the PRC Official and met with the PRC Official at times when defendant was not present. The PRC Official's cellular telephone number and fax number were

3

found stored in the telephone directory (memory) of a cellular telephone found in Kang's New Orleans residence on February 11, 2008.

### Las Vegas, Nevada, April 2007

8.  From April 6 to April 9, 2007, defendant met with Bergersen in Las Vegas, Nevada. During their stay in Las Vegas, Bergersen orally disclosed information about United States and Taiwan communications security and a breach in computer security. Certain of Bergersen's statements contained information pertaining to the national defense of the United States and were classified at the Secret level. Some time later, defendant used his laptop to send a message to the PRC Official reporting Bergersen's statements. Defendant began a section of this message by telling the PRC Official, "G told me this is top secret . . . ." While the information was in fact classified at the Secret level, defendant nevertheless knew the information was classified. Defendant also had reason to believe that the information conveyed to the PRC Official was to be used to the injury of the United States or to the advantage of a foreign nation, namely, the PRC.

9.  During the same trip to Las Vegas, Bergersen brought defendant approximately nine unclassified DoD documents and one unclassified DoD compact disc. The two also discussed having Bergersen later provide defendant with information about projected weapons sales by the United States to Taiwan for the next five years.

10. On the night of their arrival, defendant provided a total of approximately $3,000.00 cash to Bergersen for use in playing poker. Bergersen used that money to gamble over the course of their stay in Las Vegas. Defendant delivered part of the money while at a gambling casino with Bergersen: defendant handed Bergersen his wallet and allowed Bergersen to remove

an undetermined amount of currency. Bergersen exchanged the money for casino chips, which he subsequently used to gamble. Later, Bergersen and defendant attended a show using tickets that defendant had purchased for a total of $275.00.

11. The next day, April 7, 2007, defendant used his laptop to send a message to the PRC Official. Defendant reported that Bergersen had not brought him the "gig," a reference to a document discussing the Global Information Grid, a world-wide network that links together major DoD sites, but that Bergersen had said he would send defendant "as much as he can when he goes back to dc." Defendant also reported to the PRC Official that Bergersen had agreed to "print out the sale of T for 5 years," a reference to projected weapons sales by the United States to Taiwan. Finally, defendant reported that Bergersen brought "books," and then listed by name the nine unclassified DoD documents he had received from Bergersen.

12. On the evening of April 7, 2007, defendant and Bergersen had dinner at a restaurant in Las Vegas. Defendant paid for the meal, and the two men then attended a concert using tickets previously purchased by defendant for a total of $597.45.

13. The next day, April 8, 2007, defendant used his laptop to send another message to the PRC Official, reporting the schedule for his upcoming trip to the PRC. Defendant also reported that he had "recor[d]ed something you might find interesting," a reference to a recording made by the defendant of Bergersen disclosing information to defendant.

### Charleston, South Carolina, May 2007

14. On May 8, 2007, defendant telephoned the PRC Official, who asked about the status of the "GIG" document. Defendant responded "21st, 21st," a reference to his planned May 21 meeting with Bergersen in Mt. Pleasant, South Carolina, just outside the Charleston area.

Defendant also told the PRC Official that Bergersen was looking for an unmarked copy of the "roadmap," a reference to a DoD document in which classified portions had been redacted. Finally, the PRC Official asked defendant whether he had additional information from Bergersen regarding projected weapons sales by the United States to Taiwan for the next five years. In a separate telephone conversation earlier that same day, the PRC Official complained to defendant that defendant and Kang had not been available to him, and he asked rhetorically, "Where has everyone gone to?"

15. On May 15, 2007, defendant sent an email to Bergersen at DSCA reminding him "to bring the gig and taiwan paper." The next day, defendant spoke to Bergersen by telephone and said, "last time you gave me some roadmap . . . a lot of stuff is blacked out, do you have anything without black out?" By this request, defendant sought what he thought was classified information that had been redacted ("blacked out") from a document.

16. When they later met on May 21 at a hotel in Mt. Pleasant, South Carolina, Bergersen brought defendant a number of DoD documents, including one entitled GIG Tactical Edge Networks Engineering White Paper Version 0.4 (dated August 26, 2005, "For Official Use Only, Draft") and another that was marked for limited distribution. Bergersen gave the documents to defendant while they were in Mt. Pleasant.

17. Defendant later returned to Louisiana and on May 27, 2007, he telephoned the PRC Official to report that he had documents to deliver, but would not be traveling to the PRC until the end of June 2007. The PRC Official directed defendant to mail the documents to "that address from last time" and to provide a tracking number when he had done so. The next day, May 28, 2007, the PRC Official sent an email to defendant asking, "Why not asking K bring

those bks??tell me the names of Gbk to hut...by pg." K refers to Kang, bk refers to books or documents, G refers to Bergersen, and pg refers to PGP encryption software periodically used by defendant when communicating with the PRC Official.

18. On May 31, 2007, Kang sent an email to defendant with the subject line "address." The email included a single name, an address in Hong Kong, and two telephone numbers in Hong Kong that belonged to the PRC Official. The same name, address, and telephone numbers also appear in an address book found in Kang's residence on February 11, 2008. The PRC Official sent an email to defendant over two months earlier in March 2007 with the same name and address. The day before the PRC Official's March 2007 email, defendant made two telephone calls to Kang, asking in the first that she tell the PRC Official that he "bought the book from Congress" and needed direction on what to do with it. In defendant's second call, Kang told defendant that the PRC Official, "said that if you bought a book to have you mail it to the Hong Kong address." Defendant told Kang that he did not have the Hong Kong address with him at that time, and he told Kang to ask the PRC Official to email the address. Defendant telephoned Kang the day after he received the address in the March 2007 email from the PRC Official and confirmed that it had arrived.

19. On June 1, 2007, the PRC Official sent an email to defendant asking, "K told u the address??" Defendant responded that he had mailed "it" yesterday. Defendant telephoned Kang a few days later on June 4, 2007, and Kang told defendant that the PRC Official wanted the tracking number for the package. Defendant emailed the tracking number to Kang later that same day.

20. The next day, June 5, 2007, defendant telephoned Kang. Kang reported to defendant that the PRC Official said he had received "it." Kang also reported that the PRC Official had been able to open an item that Kang understood defendant to have sent by email the day before, June 4, 2007. Defendant asked Kang to call the PRC Official and to ask specifically whether he had been able to open the two documents sent yesterday, referring to June 4, 2007. Approximately five minutes after the conversation ended, defendant telephoned Kang. Kang told defendant that the PRC Official said, "the ones from yesterday can be read. He had said some drawings was sent. Is it?"

## Loudoun County, Virginia, July 2007

21. In early July 2007, defendant and Bergersen made plans to meet on July 14, 2007, in the Washington, D.C., area. During one such telephone conversation on July 9, defendant reminded Bergersen that Bergersen had previously said that he was going to give defendant "that five year Taiwan sale." In a later call the same day, Bergersen asked defendant if he was referring to sales to Taiwan for the past five years or projected sales for the next five years. Defendant responded, "yeah," and Bergersen replied, "that's hard stuff to get. Um, I'll check into it. I'll, I'll look see what I can do."

22. On July 9, 2007, defendant telephoned Kang. Kang told defendant that the PRC Official said to let Kang convey the message to the PRC Official if defendant were to "buy any books" in the District of Columbia.

23. On July 10, 2007, in a telephone conversation about defendant's upcoming trip to the Washington, D.C., area, defendant reminded Bergersen that he wanted five years of Taiwan's weapons purchase information. Later that same day, Bergersen told defendant over the telephone

that he had obtained everything the United States had delivered to Taiwan from 1980 to the present, as well as the projected sales for the next five years. During this conversation, defendant told Bergersen he wanted "DSCA's paper" and that he already had the "CIA's paper." Bergersen told defendant that what he wanted was "all classified" and that they had to be "very careful about it." Defendant responded, "I will, I will. Don't worry, don't worry."

24. On the morning of July 14, 2007, defendant flew from Louisiana to Baltimore Washington International Airport (BWI). Defendant rented a car at BWI and drove to Bergersen's residence in Alexandria, Virginia. Once he arrived, defendant gave Bergersen a box of cigars. The two went inside Bergersen's house for a few minutes, then both left in defendant's rental car en route to Washington-Dulles International Airport (Dulles), where Bergersen was scheduled to board a flight to Bulgaria later that same day. While in the vehicle, defendant placed into Bergersen's front shirt pocket a folded stack of cash in the amount of approximately $3,000.00. Shortly thereafter, Bergersen told defendant that he was "very reticent" to let him have certain information because it was "all classified," but that he could see it and take all the notes defendant wanted. Bergersen also warned defendant that if the information fell into the wrong hands he "would be fired for sure" and would "go to jail."

25. Defendant and Bergersen stopped for lunch at a hotel in Loudoun County, Virginia, before reaching Dulles. Bergersen handed defendant portions of the Taiwan section of a 2007 report of foreign military sales prepared by DSCA for Congress, listing the quantity, dollar value, and names of weapons systems planned for sale by the United States to Taiwan over the next five years. The document was several pages long with visible, jagged cut marks at the top and bottom of each page. Bergersen pointed out the fact that he had cut off the document's

title and had also removed the classification markings from the top and bottom of every page. Bergersen also told defendant that he intended to destroy the document. The document contained information pertaining to the national defense of the United States and was classified at the Secret level.

26. Thereafter, while seated in the hotel restaurant, defendant recorded notes, by hand, from the document Bergersen had given him to review. Defendant remained at the restaurant table and spent approximately one hour recording notes. Defendant then went out to his rental car and handed the document to Bergersen. After the two resumed their drive to Dulles, Bergersen told Defendant that he did not want anyone to know about their relationship because it could get him "in a lot of trouble," and he would "go to jail." Defendant responded, "I'd probably go to jail, too."

27. The next day, July 15, 2007, defendant flew from BWI to Louisiana. Later that same day, defendant used his laptop to send a message to the PRC Official, reporting that Bergersen had given him two "very, very sensitive" papers, one on future sales to Taiwan and, the other, a complete update on the Po Sheng program. Po Sheng, which translates to "broad victory," is a Taiwan program intended to improve Taiwan's capabilities with certain military functions, including, command, control, communications, computers, intelligence, surveillance, and reconnaissance. This group of military functions is known by the acronym C4ISR.

28. On July 17, 2007, defendant sent an encrypted email to the PRC Official requesting an advance of funds for July, August, and September 2007, explaining, in part, that he had given Bergersen a lot of cash. Defendant telephoned Kang later that day and Kang reported

that the PRC Official was in Beijing. Defendant told Kang to "ask him if he saw my email. I- I- I was telling him I need some money."

29. On July 19, 2007, defendant telephoned Kang in the PRC and she was with the PRC Official. Kang handed the telephone to the PRC Official. After a short conversation, the PRC Official returned the telephone to Kang and defendant told her that he would arrive at three o'clock, referring to his arrival time in the PRC on July 21, 2007.

30. On July 20, 2007, at O'Hare International Airport in Chicago, defendant boarded a flight to Beijing, PRC. Department of Homeland Security personnel searched defendant's belongings just before he boarded the plane and photocopied several pages of handwritten notes found in defendant's carry-on bag. Defendant had recorded the notes from the document provided by Bergersen when the two met in Virginia on July 14. The document contained information pertaining to the national defense of the United States that was classified at the Secret level.

31. Kang met defendant at the airport in Beijing when he arrived on July 21, 2007. Defendant told Kang about the search that took place at O'Hare International Airport. Defendant later delivered to the PRC Official the handwritten notes recorded from the document provided by Bergersen when the two met in Virginia on July 14. Defendant knew the document contained information pertaining to the national defense of the United States and was classified. Defendant also had reason to believe that the document was to be used to the injury of the United States or to the advantage of a foreign nation, namely, the PRC.

32. Defendant returned from the PRC to the United States on July 31, 2007. Two days later on August 2, 2007, defendant telephoned Kang. Kang reported that the PRC Official

11

telephoned her and asked if defendant had arrived home safely. Kang told defendant that she said yes to the inquiry, then asked, "you were searched - searched - uh someone got scared?" Defendant told Kang that he had not in fact been searched.

### Alexandria, Virginia, September 2007

33. On September 2, 2007, defendant telephoned Bergersen and the two discussed defendant's upcoming trip to the Washington, D.C., area. Defendant asked Bergersen to make reservations for them at a Virginia restaurant. He also requested that Bergersen provide him with information about an Interoperability Management Board (IMB) conference that Bergersen had attended in August 2007. Bergersen agreed to provide defendant with the requested information.

34. On September 10, 2007, defendant and Bergersen met for dinner at a restaurant in Alexandria, Virginia. At that time, Bergersen provided defendant with an IMB conference brochure and a summary of classified information describing communications between the United States military and certain foreign nations or organizations. Bergersen told defendant to be "very, very, very careful" with the documents, cautioning him not to lose them. Defendant promised Bergersen that he would not lose the documents. The documents contained information pertaining to the national defense of the United States and were classified at the Secret level.

35. Two days later, defendant reported to the PRC official by telephone that he had received a "very sensitive" document from Bergersen. The following day, defendant retyped into his laptop computer, in encrypted format, the information provided by Bergersen on September 10, 2007, which he then sent to the PRC official. The defendant knew his communication to the PRC Official contained information pertaining to the national defense of the United States.

Defendant also had reason to believe that the information was to be used to the injury of the United States or to the advantage of a foreign nation, namely, the PRC.

36. At all times during the above-described incidents, defendant KUO acted unlawfully, knowingly, and willfully, and not by mistake or other innocent reason.

Respectfully submitted,

Chuck Rosenberg
United States Attorney

By: *(signature)*
W. Neil Hammerstrom, Jr.
Assistant United States Attorney

*(signature)*
Aaron M. Zebley
Assistant United States Attorney

*(signature)*
Ryan Fayhee
Trial Attorney
U. S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Tai Shen Kuo, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Tai Shen Kuo
Defendant

I am Tai Shen Kuo's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Plato Cacheris
Counsel for Defendant

_____
John F. Hundley
Counsel for Defendant